in Vanem v. InVivo Therapeutics Holdings Corporation at Ball. In April of 2013, InVivo issued a press release announcing perhaps the most important development in the company's history, that the FDA had approved a human trial of its so-called scaffold product for patients with acute spinal cord injuries. And they announced that the FDA had approved the trial for treatment of five patients. And they also chose to announce a timeline for conducting the study of the trial. And then in May, just a month later, the company issued a press release saying Wall Street has noticed the FDA approval, our stock price has appreciated significantly as one would expect it would with such an important development, and that the increase in the stock price permitted the company to call warrants that would raise $16 million that the company badly needed because it had no revenue, it had no other products, and it was spending money, millions of dollars a quarter. Just a couple of months later, in August, they issued another press release regarding the FDA's action, and they disclosed for the first time that the FDA's approval was conditional, that they had to stagger the trial, enrolling one patient at a time, following that patient before applying for permission to enroll the next patient. They changed the timeline of the study, saying we're not going to start it in a couple of months, mid-2013, but they didn't expect to enroll the first patient until sometime in the first quarter of 2014. Subsequently, it was much later than that that the first patient was actually enrolled. And they also changed the time that it would take to enroll all of the five patients. The new timeline that was announced in August caused a dramatic drop of 40 percent in the company's stock the day of the announcement, additional drop in the following day. Defendants just say, well, this is fraud by hindsight. The company, we don't allege that what they said in August, they didn't know in May. We don't just say they must have known it in May, excuse me. Both statements concern the same FDA approval letter that had been in the press release. And defendants say, well, this is a classic fraud by hindsight case. There's no cnr. There are no internal documents that would indicate that the company knew in April what it knew in August. And the FDA letter is exactly such a document. They chose to issue the rosiest statement possible about the FDA approval. Well, in the initial press release that Envivo issued, right, I think I've looked at that fairly carefully. I haven't been able to find anything false in that report. So I think your argument boils down to the fact that there were things in that report that were misleading. Is that correct? Or is there something in it you contend is false? I think the thrust of the case primarily is that they failed to disclose material information. Okay. But is there any statement in the original press release or the original two press releases that you contend is false? I'm trying to get the issues narrowed in my head. Yes. Well, certainly it was false that the FDA approved the study and they would be studying five patients. The FDA approved one patient only. And you had to follow the patient for three months. But the FDA approval letter clearly contemplates, does it not, that there would be something to prove them to start on one patient? It contemplates five patients. Yes. All right. And they say, well, what we said in the press release echoes the FDA letter. They pick words out of the letter. The word approved appears in the FDA letter without question. But it said approved with conditions and critical conditions, important conditions. And the FDA letter says the study will occur five patients over 15 months. That's what's contemplated. Right. But it's not what the FDA had approved. Now, so why were those conditions so critical? I mean, some of them go to improvement in the consent that a subject of investigation would have to sign, for example, or perhaps some changes in the study protocol. They're numerous. But in what way were they a material obstacle to the investigation going forward? Frankly, it seems there's a certain routine and quality that they're important, but not the kind of conditions, it would seem, that are in any sense deal breakers that would affect the fundamental inquiry that the FDA had approved. I think there are a number of things, Your Honor. And of course, we're at the motion to dismiss stage. We haven't had discovery. But I think the most important one, and this is where the district court really went wrong, the most important one is that the FDA said you, quote, need or, quote, it was needed to redesign this study if it's going to support the next stage study. This was, according to the FDA letter and according to the company's own announcement, this was an early preliminary feasibility study. They were going to be testing the product for safety in a small number of patients, five patients. And the FDA letter clearly stated, in two different places, that you need to redesign the study if this study will support your next stage study. And in Vivo's own press release talked about when we complete this study, we will then apply for a, quote, unquote, pivotal study, randomized control group, the kind of studies that you do to prove the effectiveness of a product. And that was critical to ever commercializing the product. And the FDA said you need to redesign this study if it's going to support a future application for a future study. The FDA clearly said, and they will argue this, I'm sure, that you can commence the study now if you want to with one patient, one patient only. You can commence it if you want to. But you need to redesign the study if you expect this to support a future study. And the redesign took many, many months. The company announced in December, this is from April to December, after having said we're going to start this study in mid-August, mid-2013, June 30, July whatever, and gave this rosy statement that we have approval, no limitation, no conditions. We have approval. We're going to study five patients. It's going to take this long to do it. We're going to start in a month or so. They then had to redesign the study, and in December they announced that the FDA had at that point conditionally approved the redesign. And it wasn't until 2014 that the redesign was approved. The defendants chose to push out this timeline, to announce this timeline. Having chosen to make that under the Rotor case, I'm sure Judge Selye will remember. He was on the panel in the Rotor case. They chose to make this statement. And having made the statement, they had the duty to make it complete and not misleading. Judge Selye, this 15-month timeline was the timeline that the FDA itself referred to in the approval letters. So they were, as I understand it, they were not creating that 15-month timeline out of whole cloth. They were simply reflecting the timeline that the FDA itself had set forth in the approval letter. Is that not so? Well, the approval letter is basically just arithmetic. You're going to study five patients for three months at a time. That takes 15 months, but you don't allow for the time to get approval for each successive patient. Well, who says you have to, counsel, who says you have to allow for that? That seems to be implied or stated in your argument, but the FDA didn't seem to allow for it. They're the ones in their letter that used the 15-month period. And then they talk about, you know, we're going to stage it, and you study one for three months, and then you add another and study for three months, and the total will be 15. But why is it that you must read into that that it would take longer than 15 months? Well, the FDA said you have to apply for permission to enroll the next patient. Right. But there's nothing that prevents you from applying for that permission while you're studying the first patient. Well, no. I think you said you have to study the patient for three months and then submit data on the patient. Yeah. But the bigger issue is this need to redesign the study. I think that's a longer period of time. And when you think about materiality under the Rotor Standard or other cases, did you omit to disclose material facts? Defendants chose to disclose a timeline in April. They didn't have to. They chose to disclose that. They considered it material to disclose Clearly, the senior executives of this company carefully considered how to announce this. This wasn't a routine quarterly report. Did you make this need to redesign argument before Judge Stearns? Absolutely, Your Honor. Very clearly. And they also argued that we didn't argue below that approval was false and misleading, that the timeline wasn't false and misleading. It's right in Judge Stearns' opinion. No, those are in Judge Stearns' decision. But the timeline, Judge Stearns said there was no immediate barrier to enrollment. We argued very squarely that the need to redesign the study was a material barrier to enrollment. And that's where he went wrong in his opinion. And he said, well, this concern changes to support a future study. Yes, but the whole point of this study was to be the predicate for a future application that was necessary for a further study to allow commercialization of the product. This is a for-profit company. Ultimately, they want to get permission to commercialize the product. And while the FDA certainly said, we don't require this, but you need to do it. And there are plenty of cases that say there's a material omission when the FDA expressed reservations. There's an Adeline case we cite, the Dura Pharmaceutical case we cite, other cases that are in the brief. And they say, well, the changes that we made reflected in the December press release, the redesign of the study, the delay in commencement of the study. That had nothing to do with what the FDA's letter said. Counsel, what about this sort of the speaks, caution argument relating to, I mean, you have language in the press release that at least seems to be carefully crafted to avoid some of the legal issues that you see. We expect the study to begin at a certain point. We intend to submit that at a certain point. So there is some inherent contingency in that language, which arguably should put a potential investor on notice that there's nothing foolproof about all this. Don't they get some traction from that kind of language in arguing against the position that you're taking? They say this may or may not happen, but not if they don't disclose material information in the FDA letter that impacted directly on that. To what is the old saying, you know, not to warn of something that's already occurred is fraud. To warn that something may happen in the future, that's a cautionary statement. But if you don't warn something that's already occurred, they chose to put the timeline in the press release. And look at the market reaction when a revised timeline is issued. That clearly shows a material omission from what they said. Again, those material omissions are the failure to disclose those conditions that the FDA explicitly set forth in its letter. Yes. That we discussed earlier. Yes. Those are the omissions you're relying on. It's primarily that you're enrolling patients one at a time. You have to follow for three months. And very important that you need to redesign the study. That's a critical study. And I think where Judge Stern said, well, the FDA said it wasn't required. And they said, well, the FDA just recommended it. Well, there are lots of cases where the FDA recommends something, but they can't require a company to do something. They can just say, this is what we think you need to do. And they did use the word you need to do it in the letter. And that's what caused this delay. And for them to say, well, the delay had nothing to do with the conditions in the letter because when we announced the delay, we referred to the FDA approved protocol. Well, they said approval in April. I mean, they say approval all the time. It doesn't mean that it was an approved protocol. And I think that's critical. I mean, this study is still going on today in 2016. The first patient wasn't enrolled until October of 2014. And for them to issue this press release, picking words out of the FDA letter, FDA approved, five patients, 15 months, without disclosing the other things in the letter that call into question, and investors would want to know to say, well, the timeline that they project, is this a reasonable timeline? Can we rely on it? Where do you see the timeline as beginning according to the April press release? That they would start the study. They were going to finalize details and start the study in a couple of months. In the next few months. Mid-2013. Isn't the next few months more flexibility than what you're giving it? Well, I think to say that without disclosing that the FDA told them they should redesign the study. And they'll say, well, maybe we could have redesigned it in a couple of months. But they didn't, investors would like to know that. Redesigning a study is a major, major issue. Look at how long it took them to do it. It was into 2014 before it was redesigned. Just very quickly, if I might. Aren't there references in the press releases to SEC filings that can be referred to, to perhaps understand more detail about the FDA letter? Would those filings themselves, would the, for example, would the FDA letter in its entirety be found in those filings? Would there be more detail about the letter in those filings? No, it was a non-public letter. It was not in any filings. And so those filings do not amplify in any way the information that the company disclosed in the press releases? No, absolutely not. The FDA letter came to light when defendants attached it to their motion to dismiss. And they persuaded Judge Stearns. Well, the FDA letter said the, was approved. The FDA letter said five patients over 15 months. And I think Judge Stearns has not looked carefully enough when he said, well, there was no material barrier to enrollment. And with all respect, the need to redesign the study was a barrier to enrollment. And facts prove that out. And they can say, well, that's fraud by hindsight. But they did not disclose in the press release the conditions of the FDA approval. And the market was entitled to know that. Thank you. If I could, just approach, I have this, it isolates some of the quotes. These are all direct quotes from their press release compared to the letter. I've given a copy to my brother. If I could hand it to the clerk. No. No.  Thank you. May it please the Court, good morning. Mike Bongiorno on behalf of In Vivo. Just a couple of quick responses to Mr. Shapiro. He tried to expand the record today by telling the court that the study is still going on in 2016. I guess he neglected to tell the court that it didn't take 15 or 18 months to enroll these five patients. It took 11 months to enroll them. So it's not even fraud by hindsight, this timing issue that he's trying to advise the court about. So because he feels free to expand the record contrary to our rules, you feel free also to expand. I just want to clarify what actually happened, Your Honor. If he's going to say something to expand the record that isn't true. Two wrongs. Don't make a panel that's going to listen. Understood, Your Honor. Understood. In any event, Judge Stearns didn't find that the FDA said 15 months. The FDA said 15 months in the letter. He didn't strain to find it somewhere in the letter. That's what the FDA says. And the FDA said that, and at worst, the Judge Stearns said, we merely parodied it. But in fact, we gave ourselves 18 months, not 15 months, to complete the enrollment of this study. So if there were some issue with regard to how long it would take to go from patient one to patient two to patient three to patient four to patient five, we incorporated that into our timeline, certainly did the best we could under the circumstances at that time. So it's very hard to say that looking at that letter and looking at what we said, there was somehow something false, something that wasn't warned about, or something that was false in any way that was with Scienter. I would certainly say that. Well, unless you knew at the time that a redesign was going to be required and it was going to take past into the month of October at least before that redesign was completed. Understood, Your Honor. But there's nothing like that in this record, and Mr. Shapiro doesn't really argue that. In fact, what all he says is – I thought what he was arguing was that when the FDA says you need to do X and X is actually going to be required for you to ever get it to market, that that's enough. He does say that, Your Honor. But I think that argument misses the mark by a very wide margin because, first of all, the letter – while he says the letter erected a barrier to begin the study, the letter says you may enroll one patient at this time. And it does not say if you want. Mr. Shapiro must have said five times it says you can enroll a patient if you want. It doesn't say that. He's making it sound like the letter says you can do so now, but you do so at your own peril. It welcomes us to start the study, and it welcomes us to start it immediately. But despite that, we gave ourselves three months, a quarter of a year – not a couple of months, three months, maybe more, because the first press release was in early April, and we said mid-2013, I think the year was. So we gave ourselves a few months to start a study that the FDA said we could study that day. It said here are some things that you need to do in the next 45 days. And he makes it sound like the study needed to be redesigned as if it needed to be built from the ground up again. And as I think Judge Lopez said earlier, I mean, some of these 13 conditions were things like put an Rx next to it or expand that out to, say, prescription. I mean, some of these things could have been done more quickly than it took me to describe them just now. And he's saying we had to redesign the study. We did not have to redesign the study. That is not what happened. And he also says, well, the FDA can't require you to do anything. The FDA can most certainly do something, which is say, you can't start the study. Of course, they can't make us do whatever it is they want us to do, but they can tell us, don't start the study now. Don't do it. This is a very significant thing. We're putting a device in the spine of somebody who suffers from paralysis after some traumatic event like a motorcycle accident. They're not going to have us waste our time and their time and endanger people, theoretically, if the study is a complete waste of time. But instead, they send a letter that says, you can start it now. And Mr. Shapiro's basis for scienter is this letter. That's all he has. And he has it because we gave it to him, and we gave it to him in the context of this case. He didn't have this letter when he filed the case. We put it in in our motion to dismiss, and we put it in to show the court that the language in the first letter came straight from the FDA. And it's pretty hard to say that we acted with scienter solely on the basis of a letter that a federal judge read in the context of our press releases and said, our press releases are not false or misleading. Even if this court were to disagree with that notion somehow, which, of course, we defend vigorously, and we believe the press releases are not false, not misleading, and are completely accurate. But even if this court were to disagree, imagine a situation where this court were to say that this letter not only shows that the press releases were false, but they were made with scienter in the face of not only us submitting it to the court, but Judge Stern's reading the letter and not finding it. Because simply saying something that's false or misleading obviously doesn't get you to scienter. The Abiy Ahmed case from this court last year says exactly that. You have to knowingly say something that's false or misleading. Pretty hard to say we knowingly said something that's false or misleading when a federal judge has looked at it and said it isn't false or misleading. How could we have knowingly done so? That, to me, seems to be a pretty severe defense. Counsel, you emphasized that the FDA letter said you could begin your study immediately. And yet there were these conditions that we have talked about. Were those conditions relevant because the FDA was saying, yes, you can begin your study now, but to the extent that you contemplate as many as five subjects, before you can move on to the second subject, you have to comply with these conditions. In other words, weren't those conditions very important in terms of your ability to go beyond the one subject that you could study as part of the beginning of the investigation? Understood, Your Honor. There are two separate sets of conditions. I think the set you're talking about is the set that says you can start now, but in the next 45 days you need to do this. There's no argument that we weren't able to do that in 45 days. Obviously, the FDA thought we could do it within 45 days. They're not in the business of placing impossible deadlines on us. You know, start the study now and do this in 45 days, but, of course, that's unreasonable. We know you can't. So there's nothing in the record that the assumption that doing that within 45 days would be unreasonable. And, frankly, we gave ourselves three months cushion before we were even going to enroll the first patient. So we gave ourselves twice as much time before the first enrollment, and the FDA didn't even require that we do those things before the first enrollment. 45 days would not have held up enrollment of the second patient, which couldn't have occurred for 90 days anyway. That's right, Your Honor. That's right. So there's a pretty wide margin for error. I hesitate to call it error, but a pretty wide cushion in what we anticipated doing, what we intended to do, what we said we expected to do, and what the FDA laid out for a timeline for us to do it in. So the FDA is pretty knowledgeable about this, and the FDA sends us a letter setting forth do this in 45 days. You can start now. It will be five subjects, three months each, a total of 15 months. And we give ourselves three months to start the study. We give us 18 months to complete five patients' enrollment and get data to the FDA. It all seems quite reasonable. Certainly at the time, there's no reason to think that those things couldn't happen. With regard to the Bespeak's Caution Doctrine, because Judge Lopez asked about it, I think it's quite important here because to the extent Mr. Shapiro is relying on these statements about the timing, he's very focused on you couldn't have done this in this amount of time, you couldn't have done that in that amount of time. Those are all clearly forward-looking statements. And in our statements, we made quite clear the start of clinical trials can be delayed or take longer than anticipated for many and varied reasons, many of which would be outside of our control. Regulatory agencies may require us to delay clinical trials on various grounds. That's a pretty specific warning about what might happen here. And investors understand this is a very early-stage company. This has never been done before. This has never been implanted into a human being before, and there may be delays, and we warn about those delays. This isn't, Mr. Shapiro would say, I know because he said it today, no, this is different. The risk had already come to pass and you didn't tell anyone about the risk. That's not true. The FDA said you can start the study now. You can start it now. What are we supposed to warn about there? The FDA told us we could start it now. Of course there could be delays in what we were doing, and we warn about that. But we gave ourselves three months to start the study. We gave ourselves 18 months to get through these five patients, and we warned that, of course, that might not happen. And in August we issued another press release, which apparently he has no problem with. The August press release says we're going to start the study later than anticipated. That also turned out to be a little bit overly optimistic, but no one's accusing our new CEO or CEO at the time, Mike Astro, of committing fraud, when he gave an estimate about when he thought the study would start, and he turned out to be wrong. Why? Because you can't know something in the future. You can only state what your intention is, and it was a pretty fair statement of what our intention was at that point in time. And Judge Stearns got it exactly right when he said, at worst, we're pirating what the FDA said. That certainly isn't security fraud. It's not even false. The statements are all forward-looking, and they bespeak caution, and there's certainly no scienter. There's nothing even close to scienter here. There were no immediate barriers for enrollment. The FDA said we could enroll right then and there. If there are no further questions. Thank you both. Thank you.